[Cite as *State v. Griffin*, 2024-Ohio-5846.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo          Court of Appeals No.  L-24-1030

    Appellee          Trial Court No. CRB-23-12000

v.

Kristeena Griffin          **DECISION AND JUDGMENT**

    Appellant          Decided:  December 13, 2024

* * * * *

Tyler Naud Jechura, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a bench trial, the defendant-appellant, Kristeena Griffin, was convicted by the Toledo Municipal Court of two counts of assault and one count of domestic violence and sentenced to probation.  For the following reasons, we affirm.

# I. Background

{¶ 2} On December 17, 2023, Griffin was living alone, in her late grandfather's home, located on Elmwood Street in Toledo. Family members "allowed" Griffin to live there because it was wintertime and she "had nowhere to stay." The record indicates that Griffin has long-standing mental health issues that have caused significant problems over the years.

{¶ 3} Griffin testified that in the late afternoon that day, she went outside "to address" the "little hellions" who were "running amuck in the neighborhood, holding people hostage, tearing shit up and leaving trash everywhere." Afterward, Griffin went back inside to "blast[]" music "as a form of personal relaxation and self-therapy."

{¶ 4} During the incident outside, Griffin's younger sister, M.K., received a call from someone in the neighborhood who reported that Griffin was outside "doing very bizarre, erratic things," including "threatening neighbors." M.K. testified that Griffin had also recently sent "alarming" messages to their mother, calling her "worthless" and saying that mother "should just kill" herself and Griffin. In light of these events, M.K. and her boyfriend, B.A., drove to the house, where they were joined by another sister, H, and Griffin's step-father ("step-father"). Stepfather also acted as Griffin's landlord and had a key to the home. The purpose of their visit was to do a "well-check" on Griffin and to "see what was going on with her."

{¶ 5} By the time the family members arrived, Griffin was back inside "blasting music very loud," which was "abnormal for her." M.K. knocked on the front door and

2.

told Griffin that she wanted "to talk." Using step-father's key, M.K and H unlocked the door, but because Griffin was sitting against the door on the interior side, "you couldn't get in." Talking through the door, M.K. repeated that it was "just" her and H, and that they wanted "to come in and talk." According to M.K., "when we let her know it was just me and [H], she got off the door and allowed us in the house."

{¶ 6} H walked in first, without incident. But, "[a]s soon as [M.K.] walked in," Griffin "grabbed" and "tossed" her two to three feet into a wall, hurting M.K.'s arm "a little bit." After Griffin attacked M.K., the other members of the group—B.A., stepfather, and H—"tried to hold [Griffin] back [b]ecause she was going after everybody to charge and attack them." M.K. watched as Griffin "headbutted" B.A. in the head, twice, which "[a]lmost knock[ed] him unconscious." Ultimately, step-father and H "got her to sit down" on the couch, even as Griffin was "still trying to fight people" and continuing to say things that "made no sense."

{¶ 7} B.A. testified that Griffin "agreed to let her sisters come in the house" while he and step-father "agreed to stay outside" in an attached "porched-in area." Despite the "agreement," Griffin "attacked" M.K. "the moment she stepped in[side]." And, when it appeared to B.A. that Griffin "was about to charge at the father," B.A. "held her back" by "bear hug[ging]" Griffin "at the doorway." After a two to three minute "standstill," B.A. released her because he thought that Griffin had "de-escalated." Instead, Griffin headbutt B.A., twice, in the side of the face. The first headbutt did not cause pain because B.A. was still "braced," but the second headbutt was painful.

3.

{¶ 8} Griffin testified in her own defense.  She recalled "leaning against [the door]," but denied allowing anyone entry, including her sisters.  According to Griffin, "[all four] fought their way into the house."  The scuffle began in the doorway, where Griffin was "force[d] . . . backwards" into the house and "end[ed] back on the couch."  Griffin claimed that while she was being held, M.K. "pinched [her] right nipple" and step-father "pinched [her] left."  In response to her family's "craven" and "demonic" actions, Griffin "did a little thump . . . towards [step-father's] nutsack" and "headbutt the shit out of [B.A.] twice," because she was the "least familiar" with him and "who the hell [was he] to be touching me right now."

{¶ 9} Griffin emphasized that she "absolutely" did not give anyone permission to enter her home, and claimed to have told them that "[t]his is illegal" and "[y]ou don't have the right to be here."   Later, the police entered the home and arrested Griffin in her upstairs bedroom, which she claimed was also "illegal."

{¶ 10} Griffin was charged with three misdemeanor offenses:  two counts of assault, in violation of R.C. 2903.13, and a single count of domestic violence, in violation of R.C. 2919.25(A).

{¶ 11} Following a bench trial on January 17, 2024, the trial court found Griffin guilty as charged and convicted her on all counts.  In its Amended Sentencing Entry, dated March 5, 2024, the trial court found that the assault offense (as against M.K.) and the domestic violence offense (also against M.K.) were allied offenses, which merged for purposes of sentencing.  The trial court then sentenced Griffin to 180 days in jail, as to

4.

the domestic violence offense, and an additional 180 days, as to the other assault offense (as against B.A.). The court then suspended each jail term and placed Griffin on community control for a term of two years.[1] The community control sanctions required Griffin to exhibit "good behavior" and to have no contact with either victim or the home on Elmwood Street. The trial court ordered Griffin to have a mental health assessment and to comply with any treatment recommendations.

{¶ 12} Griffin appealed and raises the following assignment of error for our review:

> APPELLANT'S ASSIGNMENT OF ERROR: The trial court errored [sic] when it did not find Ms. Griffin acted in self-defense and instead convicted her of domestic violence when a rebuttable presumption existed that was not addressed.

## II. Law and Analysis

{¶ 13} First, we note that Griffin does not challenge the sufficiency or weight of the evidence supporting the offenses of domestic violence or assault. Rather, she challenges the trial court's finding that she did not act in self-defense. *See State v. Petway,* 2020-Ohio-3848, ¶ 46 (11th Dist.) ("The elements of the crime and the existence

---

[1] While the trial court referred to "probation" in its sentencing order, the enactment of R.C. 2929.25, effective in 2003, replaced the term "probation" in reference to suspended sentences for misdemeanors under the prior statute (R.C. 2951.02) with "community control." *State v. Wagener*, 2022-Ohio-724, ¶ 3, fn. 1 (6th Dist.), citing *State v. Mack,* 2012-Ohio-2960, ¶ 1, fn 1 (6th Dist.). Accordingly, we use the term "community control."

of self-defense are separate issues. . . Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged.").

{¶ 14} There are two types of self-defense in Ohio: (1) defense against danger of bodily harm, also known as non-deadly force self-defense; and (2) defense against danger of death or great bodily harm, or deadly force self-defense. *State v. Rice*, 2022-Ohio-3291, ¶ 58 (7th Dist.). Griffin asserted the use of non-deadly force self-defense at trial.

{¶ 15} In a case involving the use of non-deadly force, an accused is justified in using force against another if "(1) [s]he was not at fault in creating the situation giving rise to the affray; (2) [s]he had reasonable grounds to believe [and] an honest belief that. . . [s]he is in imminent danger of bodily harm, and (3) [s]he did not use more force than was reasonably necessary to defend against the imminent danger of bodily harm." *State v. Greer,* 2023-Ohio-103, ¶ 33 (6th Dist.), quoting *State v. Paskins*, 2022-Ohio-4024, ¶ 48 (5th Dist.). "Because each element must exist for a self-defense claim to prevail, the [S]tate can defeat a self-defense claim by disproving any one of these elements beyond a reasonable doubt." *State v. Knuff,* 2024-Ohio-902, ¶ 191.

{¶ 16} In *State v. Messenger*, 2022-Ohio-4562, the Ohio Supreme Court clarified the burden of proof where a defendant asserts a claim of self-defense under the version of the statute that became effective March 28, 2019. That is, "R.C. 2901.05(B)(1) triggers the State's duty to disprove self-defense so long as 'there is evidence presented that tends to support that the accused person used the force in self-defense'"—a burden that is not all that heavy. *Id.* at ¶ 20, 22 ("The reference in R.C. 2901.05(B)(1) to 'evidence

6.

presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the state's own evidence."). As such, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the State must then disprove self-defense. *Id.* at ¶ 25. In that case, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26. The State's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal. *Id.* at ¶ 27.

{¶ 17} In evaluating a manifest weight challenge involving self-defense, we must review the entire record, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the state disproved at least one of the elements of self-defense beyond a reasonable doubt. *State v. Gibson*, 2023-Ohio-1640, ¶ 12 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 18} Here, Griffin produced sufficient evidence, by way of her own testimony, that tended to show that she acted in self-defense when she assaulted M.K. and B.A.

7.

That is, Griffin testified that she "absolutely" did not give anyone permission to enter her home.  Instead, she claims that "all four of them. . . fought their way into the house" which "force[d] her backwards. . . on the couch" where they "h[eld] on to [her]" and "pinched" her nipples.  Although Griffin admits that she "headbutt the shit out of [B.A]," she claims that she did so *because* he was "touching" her.  Viewing that evidence in the light most favorable to Griffin, we find that a rational trier of fact could find all of the elements of a self-defense claim.  Therefore, Griffin satisfied her burden of production, and the burden shifted to the state to disprove self-defense by establishing beyond a reasonable doubt that Griffin (1) was at fault in creating the situation giving rise the affray; or (2) that she did not have reasonable grounds to believe or an honest belief that she was in imminent danger of bodily harm; or (3) that she used more force than was reasonably necessary to defend against the imminent danger of bodily harm.

{¶ 19} Because it is dispositive of Griffin's self-defense claim, we will confine our analysis to the first element of self-defense, i.e., whether Griffin "was at fault in creating the situation giving rise to the affray * * *."  *State v. Mitchell*, 2023-Ohio-2604, ¶ 19 (1st Dist.), citing *Gibson* at ¶ 11.  "The 'not at fault' requirement * * * means that the defendant must not have been the first aggressor in the incident."  *Id.,* citing *State v. Robbins*, 58 Ohio St.2d 74 (1979).

{¶ 20} On appeal, Griffin insists that she was "not the initial aggressor" and that her family members' actions required her to "f[ight] back."  While the state did not file a brief in this case, the record contains other evidence, namely testimony from M.K. and

8.

B.A., that Griffin "agreed to let her sisters come in the house" and that Griffin "attacked" M.K. the moment she stepped inside, even though M.K. did not "do or say anything." After "toss[ing]" M.K. two or three feet into a wall, Griffin tried "attacking everybody." When Griffin "charge[d]" stepfather, B.A. intervened to "restrain [Griffin] from . . . harming anybody else." And, Griffin "headbutt the shit" out of B.A., *after* he had released her from his bearhug.

{¶ 21} The trial court, acting as factfinder, was "free to believe some, all or none of each witness's testimony and [to] separate the credible parts of the testimony from the incredible parts." *Greer,* 2023-Ohio-103 at ¶ 41 (6th Dist.). Given the contradictory evidence presented at trial, the trial court was in the best position to weigh the evidence and to judge the witness's credibility. *State v. Speaks,* 2024-Ohio-15 (12th Dist.). In light of its verdict, the trial court clearly decided that the State's version of events was more credible. Indeed, it specifically found that Griffin "had calmed down and allowed [her sister] to enter the home. And at that point, the assaults took place." The trial court's rejection of Griffin's self-defense claim is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the State.

{¶ 22} We find that the trial court's rejection of Griffin's self-defense claim was not against the manifest weight of the evidence because, based upon the testimony and evidence presented, a reasonable factfinder could have found that Griffin was at fault in creating the situation giving rise to the affray. As discussed above, the state was only

9.

required to disprove one of the three elements of self-defense in order to defeat Griffin's self-defense claim. *Knuff,* 2024-Ohio-902, at ¶ 191.

{¶ 23} Finally, we reject Griffin's argument that she was acting in self-defense because she was "in her home" and "attempting to expel" family members who were "unlawfully present." It is true that, under R.C. 2901.09, *"a person does not have a duty to retreat before using force in self-defense if the person using force 'is in a place in which the person lawfully has a right to be.'"* *Knuff* at ¶ 193 citing 2020 Am.S.B. No. 175 (Explaining that an amendment to the statute in 2021 "expand[ed] the provision from a 'castle doctrine' provision to a 'stand your ground' provision."). *Id.* at ¶ 193, fn. 5. R.C. 2901.09 creates an exception to the third element of self-defense, the duty to retreat. *State v. James,* 2024-Ohio-621, ¶ 38 (1st Dist.). However, "it does not negate the remaining elements of self-defense." *Id.* And, because the trial court in this case found that Griffin was at fault in creating the situation, it could not acquit on self-defense grounds. *Knuff* at ¶ 196. ("Therefore, if the jury found beyond a reasonable doubt that Knuff was at fault in creating the situation, it could not acquit him on self-defense grounds regardless of whether he had a duty to retreat."); *James* at ¶ 38. ("even if appellant did not violate any duty to retreat pursuant to R.C. 2901.09(B), appellant's self-defense claim still fails where there is credible evidence that he did not have an honest or reasonable belief that he was in imminent danger."). As in *Knuff,* Griffin's self-defense claim "collapsed" once the trial court found that she was at fault in creating the situation and therefore, whether or not she had a to retreat was "irrelevant." *Id.* at ¶ 194.

10.

### III. Conclusion

{¶ 24} After our review of the entire record, we conclude the trial court did not clearly lose its way or create a manifest miscarriage of justice when it found the State proved beyond a reasonable doubt that Griffin did not act in self-defense when she assaulted and committed domestic violence against the victims in this case. Therefore, we find Griffin's assignment of error is not well-taken, and we affirm the Toledo Municipal Court's judgment. Griffin is ordered the pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.          _____
JUDGE

Christine E. Mayle, J. _____

_____

Myron C. Duhart, J. _____
JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.